**CITY OF HICKMAN, INC., Appellant,**

v.

**Paul CHOATE et al., Appellees.**

Court of Appeals of Kentucky.

May 12, 1964.

Rehearing Denied June 19, 1964.

D. L. McNeill, Hickman, for appellant.

James H. Warren, Fulton, for appellees.

PALMORE, Judge.

The City of Hickman appeals from a judgment denying its petition under KRS 81.210 to annex an area adjoining its east and southeast city limits.

As presently constituted the city embraces 398 acres. According to the 1960 census its population totalled 1531. There was a conflict in evidence on the area of the proposed addition. The mayor said it contains 250 acres. Testifying for the remonstrants, the county surveyor figured it from the map at 517 acres.[1] Estimates of its population varied from 1200 to about the same number as the present city population. Some 250 dwellings and several business establishments, including a garment factory, are located within it, and much of it has been laid out for residential subdivision.

 The back-and-forth recruitment and proselyting of remonstrants against and supporters for the proposed annexation among the resident voters of the affected area was permitted to continue through and after the trial, with the final result that the trial court concluded the remonstrants had a majority of 12. Though it was technical error for the court to permit addition and deletion of names after entry of an order taking the case under submission,[2] cf. Town of Bloomfield v. Muir, 221 Ky., 815, 299 S.W. 976 (1926), the question becomes immaterial in view of our conclusion on the merits, which is that there was insufficient evidence of material injury to warrant a denial of the annexation.

Hickman, county seat of Fulton County, is a picturesque old town on the banks and bluff overlooking the Mississippi River at the mouth of Bayou de Chien, near the southwest tip of the state. Preferring progress and prosperity to the deadening tranquillity of nostalgia, its leaders and governing body regard annexation of the area here in question as one of the steps conducive to attracting industry and bringing the community out of the doldrums. The city itself is fully developed from the standpoint of population, there being no more room within its limits for residential construction. There would seem to be little doubt that the contiguous territory sought to be annexed will soon be as densely populated as the city, though it may be less so at the instant time. The late and learned trial judge expressed the opinion on several occasions during the proceedings that some of the proposed addition ought to be annexed and some ought not. The question here involves the extent to which the courts may interfere in the discretion of the city council as to where the lines should be drawn.

The city has a fire engine and station, one paid full-time fireman, and 10 volunteer firemen. Its police department consists of a chief and three policemen, equipped with one patrol car. The city owns a water and sewer system and a natural gas distribution system and is already providing water and gas service to the residents of the area sought to be annexed.

The territory outside the city limits is under the police protection of the county sheriff, whose office is, of course, located at the court house in Hickman. Fire protection is available on a fee basis from an independent "rural" fire company which has a fire truck comparable with the city's.

---

1. The latter figure appears to be more nearly correct.

2. We say "technical error" because the order of submission could have been va- cated to allow further proof on this phase of the matter.

The city has a contract with the operator of this independent service to assist in connection with city fires, but an ordinance forbids the use of its own facilities beyond the city limits. Whereas the city is sewered, the only sewage disposal in the area sought to be annexed is provided by septic tanks or, in at least one instance developed in the evidence, by natural surface drainage. The city is presently engaged in a proposed project to construct a sewer system in a substantial part of the territory embraced within the annexation ordinance.

The proposed extension as shown on the map looks somewhat like the old-fashioned pair of kidney-shaped water-wings children used to wear at the beach before the advent of today's variety of exotically fashioned plastic creations. The right wing extends out from the east boundary of the city and the left puffs southward from the southeast corner of the city. The wedge formed by this corner of the city accentuates the wing-like appearance of the two extremities by narrowing the nexus between them. The sewer system extension as immediately planned will, if realized, serve the portion we have described as the right or east wing, which apparently is more thickly populated than the lower or left wing. The latter, however, lies between the city and a by-pass highway and, though a good portion of it is now used agriculturally, appears from the evidence to be adaptable to urban development within the reasonably proximate future.

The tangible property in Hickman is assessed for city tax purposes at $1,111,183, reflecting 30% to 40% of actual cash value. Bank shares assessed at $246,250 round out the ad valorem tax basis, in addition to which there is an occupational license tax and an annual city license tax on motor vehicles. The ad valorem tax rate is $1.35 per $100, which represents the maximum 75¢ under Const. § 157 plus a 60¢ excess rate levied to retire a 4% refunding general obligation bond issue as directed by a 1948 judgment in favor of the bondholders.[3] The balance of principal payable on these bonds at the beginning of 1963 was $45,000, and the schedule of payments extends through 1978. Regardless of what mismanagement may have led to the creation of the indebtedness necessitating the excess tax rate, an audit made by certified public accountants for the calendar year 1962 shows that the city is now operating within its means, has met the bond payments on schedule, and has accumulated in the form of U. S. Treasury bonds a sinking fund in the amount of $26,000[4] for payment of the bonds yet unmatured.

KRS 81.220 is a peculiar statute. It says that if less than 50% of the owners in the property to be annexed remonstrate, the annexation (a) must be for the interest of the city and (b) must cause no material injury to the affected property owners. But if *more* than 50% remonstrate, the literal sense of the section is that only the second of these two requirements applies, in which event it would be unnecessary for the city to prove any benefit to itself. To clarify this apparent absurdity, we are of the opinion that this cannot have been the intention of the legislature. The result is that the issues are the same regardless of the percentage of remonstrants. The only distinction is that if the remonstrants exceed 50% the burden is on the city to show a prima facie case of benefit to itself and to the property proposed to be annexed. When it has done this, the burden shifts to the property owners to prove material injury. Cf. Buchanan v. City of Dayton, Ky., 363 S.W.2d 92, 94 (1962) ; McClellan v. Central City, Ky., 375 S.W.2d 823, 824 (1964).

In City of Louisville v. Kraft, Ky., 297 S.W.2d 39, 42 (1956), City of Prestonsburg v. Conn, Ky., 317 S.W.2d 484 (1958) and

---

3. See City of Hickman v. First Nat. Bank in City & State of N. Y., 307 Ky. 702, 211 S.W.2d 801 (1948).

4. Which at the time of trial had increased to $28,000.

Mitchell v. Central City, Ky., 354 S.W.2d 281, 282 (1962), it was suggested that if the territory sought to be annexed is adaptable to municipal development, then obviously its absorption is in the best interests of the city unless the capacity of the city to function as a sound going concern would be overextended. Though some of the streets of Hickman remain unpaved, there is no evidence of substance to indicate any real possibility that its capacities would be overextended by the proposed annexation. The additional tax revenue alone, whatever it may be, is an item of tangible benefit, and among the intangible but nevertheless substantial advantages that will accrue to both the city and the owners of property within the affected area is the unifying force of one government for what is in fact one community. 3000 people working together can do more than 1500 people working together on one side of the fence and 1500 people working separately, or not at all, on the other. Annexation, in short, holds the promise of a better and more effective government for all concerned than they now enjoy separately.

 The clear policy of the law toward encouragement of municipal expansion and against a fine weighing of the relative benefits and burdens rests upon justice and good sense. This case presents an example. Here are 1200 to 1500 people with water and gas service they would not have except for the instrumentality of the city. Yet because they already have it they are able to say that coming into the city offers them no new advantages. Their lot was made better by the city, and having accepted its benefits they cannot defeat an annexation unless it is so unfair to them as to border upon arbitrariness. This rather blunt statement is intended to illustrate and emphasize the public policy out of which have sprung the salient principles applicable to this case, which are:

1. "The courts are authorized to interpose only where there will be the clear and obvious imposition of material and substantial burdens." City of Louisville v. Kraft, Ky., 297 S.W.2d 39 (1956).

2. There "must be a substantial excess of burdens over benefits in order to defeat annexation." City of Greenville v. Gossett, Ky., 355 S.W.2d 311 (1962).

3. "Municipal taxation and regulation do not constitute material injury under KRS 81.220, but are burdens to be considered in relation to benefits." McClellan v. Central City, Ky., 375 S.W.2d 823 (1964).

4. "That the territory annexed will be subject to pay a pre-existing debt of the municipality is not, as such, a dispositive objection to annexation." Buchanan v. City of Dayton, Ky., 363 S.W.2d 92 (1962).

5. Though some of the property to be annexed is not urban in nature, the question of material injury is to be determined on the basis of "the entire area and not the separate parcels of real estate in isolation." Mitchell v. Central City, Ky., 354 S.W.2d 281 (1962).

 It is our opinion that the evidence was sufficient to establish a prima facie case of substantial benefit both to the city and to the area proposed to be annexed. Together they should be able to have better police and fire protection, which in turn should conduce to lower insurance rates in the annexed territory. Zoning jurisdiction will be vested exclusively in the city, whereas now it is divided and at best could only be shared with the county.[5] A larger and stronger city government will enhance efforts to secure new industries and provide greater support for public projects. Community planning can be more intelligently carried forward. To deny all this would defeat the very purpose of annexation laws, which is to prevent the stagnation and stifling of municipal government.

 Except for city taxation and license fees, which do not constitute "ma-

5. Cf. KRS 100.850, 868.

terial injury" within the principles germane to the case, the property owners did not show any injury except that one man might not be able to keep a stockyard and others might not be allowed to keep farm animals in the city. Presumably a city ordinance prohibits these uses, though it was not introduced in evidence. Nevertheless, such isolated instances of detriment do not amount to material injury to the property of the whole area. Mitchell v. Central City, Ky., 354 S.W.2d 281 (1962).

The remonstrants having failed to prove a "clear and obvious imposition of manifest and substantial burdens,"[6] the judgment was erroneous unless it can be sustained on the theory that the annexation will violate KRS 81.280. In brief, this statute provides that an unincorporated area in which an industrial plant is located cannot be annexed without the consent of the plant unless it is embraced within a broad, comprehensive plan of annexation, is contiguous to the city, and is itself compact and contiguous, and unless the number of voters in the area equals or exceeds the number of persons employed by industrial plants therein.

An industrial plant, Hickman Garment Company, is located within the area being annexed in this case. A letter from its president to the trial judge endorsing the annexation program was filed in the record. The remonstrants contend that this does not constitute competent proof of the company's consent. Without deciding that point, we find nothing requiring such a consent. Our construction of the statute is that it was intended to protect industries against "spot" annexation. The instant annexation reflects a broad and comprehensive plan, the area is contiguous to the city and is itself contiguous and reasonably compact, and there is no suggestion that the number of voters in the area does not equal or exceed the number of persons employed by the industrial plant or plants therein. When these requirements are met

there is no need for the consent or waiver permitted by KRS 81.280(3).

The cause is reversed with directions that a judgment be entered sustaining the annexation.

6. City of Greenville v. Gossett, Ky., 355 S.W.2d 311 (1962).